IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG

JOSHUA SHANE MATHIAS,

                **Plaintiff,**

v.

                                      **CIVIL ACTION NO.: 1:17-CV-92**
                                      **(JUDGE KEELEY)**

NANCY A. BERRYHILL,
Deputy Commissioner of Social Security,

                **Defendant.**

## REPORT AND RECOMMENDATION

## I.    INTRODUCTION

On May 19, 2017, Plaintiff Joshua Shane Mathias ("Plaintiff"), by counsel, Brian D. Bailey, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant, Nancy A. Berryhill, Deputy Commissioner of Social Security[1] ("Deputy Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Compl., ECF No. 1). On July 24, 2017, the Deputy Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed her Answer and the Administrative Record of the proceedings. (Answer, ECF No. 6; Admin. R., ECF No. 7). On August 23, 2017, Plaintiff filed his *Motion for Summary Judgment*. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 10). On August 25, 2017, Defendant filed a *Motion for Leave to File a Consolidate Response* (ECF No. 11), which was granted on August 30, 2017

---

[1] According to the Government Accountability Office, as of November 17, 2017, Nancy Berryhill had no authority to act in her position as Acting Commissioner of Social Security because her appointment violated the Federal Vacancies Reform Act. As such, Ms. Berryhill will continue in her capacity as Deputy Commissioner of Operations.

(ECF No. 12). On September 7, 2017, Defendant filed a *Motion for Extension of Time to File Response* (ECF No. 13) that was granted on September 8, 2017 (ECF No. 14). Finally, on October 5, 2017, Defendant filed its *Motion for Summary Judgment* (ECF No. 17-18). Plaintiff filed their Response on October 18, 2017 (ECF No. 19). Following review of the motions by the parties and the administrative record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II.   <u>PROCEDURAL HISTORY</u>

On January 9, 2014, Plaintiff protectively filed his first application under Title II of the Social Security Act for a period of disability and disability insurance benefits ("DIB") and under Title XVI of the Social Security Act for Supplemental Security Income ("SSI"), alleging disability that began on September 19, 2013. (R. 27).  Plaintiff's earnings record shows that he acquired sufficient quarters of coverage to remain insured through December 31, 2017; therefore, Plaintiff must establish disability on or before this date. (R. 29).  This claim was initially denied on April 16, 2014 (R. 27) and denied again upon reconsideration on June 26, 2014 (R. 27).  On July 14, 2014, Plaintiff filed a written request for a hearing (R. 27), which was held before United States Administrative Law Judge H. Munday ("ALJ") on October 16, 2015, in Charlottesville, Virginia. (R. 27).  Plaintiff, represented by counsel, John Wilkinson, Esq.[2], appeared and testified, as did Barry Hensley, Ed.D., an impartial vocational expert. (<u>Id.</u>). On March 23, 2016, the ALJ issued an unfavorable decision to Plaintiff, finding that he was not disabled within the meaning of the Social Security Act. (R. 29-45). On April 5, 2017, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 6).

---

[2] While John R. Heard was Plaintiff's main representative, John Wilkinson represented Plaintiff during the hearing.

### III.   <u>BACKGROUND</u>

**A.   Personal History**

Plaintiff was born on January 31, 1978, and was thirty-six years old at the time he filed his first SSI claim. (R. 32). He completed his master's degree in agriculture (R. 61). Plaintiff's prior work experience included an RO operator at Valley Proteins; a production supervisor at Tyson's food; and a certified foreman at a quarry. (R. 62-63). He was married at the time he filed his initial claim and was married at the time of the administrative hearing. (R. 61). He has two dependent children. (R. 61). Plaintiff alleged his disability based on multiple sclerosis, anxiety disorder, and memory loss. (R. 84).

**B.   Medical History**

    **1.   Medical History Pre-Dating Alleged Onset Date of September 19, 2013[3]**

On September 11, 2013, Plaintiff met with Dr. Stauffer. Plaintiff was complaining of dizziness, weight loss, and anxiety. (R. 33). A physical examination was completed and the findings were within normal limits. <u>Id.</u> The medical records note that claimant was alert, oriented, and his cranial nerves and reflexes were intact. <u>Id.</u> Plaintiff was released and prescribed Antivert and Xanax. <u>Id.</u> Following the visit, Plaintiff's BMI was 35.23. (R. 326).[4]

On September 19, 2013, Plaintiff met with Dr. Jenkins discussing Plaintiff's complaints of his dizziness. (R. 355). Plaintiff reported that he had recently seen Dr. Stauffer who believed that the dizziness could be caused by an inner ear problem. <u>Id.</u> Plaintiff underwent a Brain and Head CT without Contrast, which showed "white matter decreased attenuation, atypical in this

---

[3] Plaintiff's medical records indicate that Mr. Mathias did not experience any symptoms related to him applying for Social Security benefits prior to his appointment at Rockingham Memorial Hospital for an annual checkup on January 15, 2013. (R. 323). However, Plaintiff did have a BMI at 42.12, which made him obese. (R. 322). Prior to March 26, 2013, however, Plaintiff had been diagnosed with abdominal pain, back pain, diarrhea, Hyperlipidemia, and Obesity. (R. 314).

[4] On March 26, 2013, following, the visit, Plaintiff's BMI was 42.12.

age group." Id. Dr. Jenkins noted that this could represent "early onset small vessel ischemic disease or demyelinating disease." (R. 358).

### 2.   Medical History Post-Dating Alleged Onset Date of September, 20, 2013

On September 20, 2013, Plaintiff was referred by Dr. Jenkins to Dr. Siddiqui for an evaluation due to Plaintiff's symptoms. (R. 303). Plaintiff describes his dizziness as severe, and each episode lasts greater than one hour and occurs spontaneously when standing. Id. at 305. Plaintiff described his dizziness as "things around him . . . spinning," accompanied with nausea. Id. at 303. Plaintiff does not suffer from photophobia nor phonophobia, but has bilateral ringing in his ears and moderate to severe headaches. Id. Plaintiff stated that rest relieves him of those symptoms. Id. at 305. Plaintiff also describes his dizziness as disorientation and confusion. Id. Following the visit, Plaintiff's BMI was 34.59.

Upon examination, Plaintiff has normal mental status, his registration was 3 out of 3, his recall was 3 out of 3, his attention was 5 out of 5, he was unable to do serial sevens, he did not have any cranial nerves deficit, he did have right hemianesthesia, he did have hyper active knee jerks as well as upgoing right plantar . . . his symptoms of vertigo and right hemianesthesia are concerning for central cause of vertigo . . . [which] could be either inflammatory or demyelinating lesion." Id. at 303. Dr. Siddiqui noted that Plaintiff had begun a diet approximately six months before this visit, and had lost approximately 62 pounds, but did not use diet pills. (R. 305).

On October 3, 2013, Plaintiff underwent a Brain MRI with and without Contrast, which showed "[w]hite matter T2 hyperintensities likely representing demyelinating disease, although early onset small vessel ischemic disease could give a similar appearance, however overall the

pattern is suggestive of multiple sclerosis." (R. 364). On October 4, 2013, Plaintiff underwent a lumbar puncture. Id.

On October 16, 2013, Plaintiff was referred by Dr. Jenkins to Dr. Siddiqui. (R. 294). Plaintiff described his symptoms of dizziness and lightheadedness, which had occurred for the previously two months. Id. During the visit, Plaintiff and Dr. Siddiqui discussed the results of the Brain and Lumbar MRI, which showed "periventricular white matter lesions suggestive of demyelination. Id. His lumbar puncture showed "lymphocytic pleocytosis, high protein and positive IgG index." Id.

On October 29, 2013, Plaintiff under a Spine and Cervical  MRI with and without Contrast, which showed no significant MR abnormality, but that "there is a focus of increased T2 signal seen at the dorsal aspect of the cervical cord at the C2-3 level, probably representing a multiple sclerosis plaque which does not show enhancement. There is no central canal stenosis or foraminal narrowing at this level." (R. 378). The MRI also showed "C3-4 is normal, at C4-5, there is moderate central canal stenosis with mild bilateral foraminal narrowing, at C5-6, there is severe central canal stenosis with cord compression but no abnormal cord signal. . . . there is bilateral moderate foraminal narrowing, at C6-7, there is mild central canal stenosis with mild bilateral foraminal narrowing." (R. 379).

On December 6, 2013, Plaintiff returned for a follow up visit for his multiple sclerosis. (R. 285). Plaintiff reported that he has seen improvements of his lightheadedness and dizziness, is walking better, but is "experiencing symptoms of [sic] left eye twitching, urgency and frequency of urine and generalized fatigue." Id. Dr. Siddiqui's examination showed that Plaintiff "has normal mental status, normal cranial nerves, normal motor strength in both upper and lower extremities, normal sensory assessment as well as gait assessment." Id. Plaintiff "was able to do

tandem walking and his Romberg is improved from last time." Id. Following the visit, Plaintiff's BMI was 37.54. Id. at 293.

On December 13, 2013, Plaintiff returned for a follow up visit due to his onset of dizziness, lightheadedness, change in pupil size, and gait unsteadiness. (R. 274). During Dr. Siddiqui's examination of the Plaintiff, Dr. Siddiqui found that Plaintiff "does not have any deficits, his pupils were 3mm bilaterally and reactice, his optic discs were normal, his motor strength is 5 out of 5 in both upper and lower extremities, he did have bilateral postural high frequency tremor, his gait was slightly unsteady and Romberg was mildly positive." (R. 278). Upon Plaintiff's follow-up visit, Plaintiff's BMI was 38.35. Id. at 284.

On December 30, 2013, Plaintiff underwent a Brain MRI with and without contrast. (R. 381), which showed that "stable appearance of multifocal areas of increased T2 signal within the white matter bilaterally compatible with demyelinating disease. No new lesions or abnormal enhancement can be seen." Id.

On February 20, 2014, Plaintiff went for a follow up visit for his multiple sclerosis. (R. 265). Plaintiff reported to Dr. Siddiqui that he had improvement of his symptoms of lightheadedness, gait unsteadiness, and dizziness, but is experiencing daytime fatigue. Id.; Id. at 267. The medical records demonstrate that Plaintiff awakens approximately three to four times in the night to use the bathroom, and his aqua sleepiness score was 19/24, which indicates severe sleepiness. Id. at 265. During the examination, Dr. Siddiqui noted that Plaintiff "has normal mental status, normal cranial nerves, he has finger-nose-finger with dysmetria bilaterally, he has unsteady gait and positive Romberg." Id. During this follow up, Plaintiff's BMI was 39.38. Id. at 273.

On March 27, 2014, Plaintiff underwent a Polysomnogram Result, which demonstrated abnormal results due to "[t]he presence of sleep architectural abnormalities: reduced sleep efficiency, increased wake after sleep onset, the absence of stage 3 sleep, and increased stage 2 sleep, multiple cortical arousals as well as multiple stage transitions, there was presence of severe obstructive sleep apnea with increasing respiratory arousal index, mild periodic limb movement disorder was noted." (R. 389).

On April 11, 2014, Plaintiff went for a follow up visit for his sleep study, which demonstrated a presence of severe obstructive sleep apnea. (R. 395). The medical records show that Plaintiff exhibited "severe desaturations up with his sleep apnea." Id. at 398. On May 22, 2014, Plaintiff underwent a polysomnogram with CPAP, which showed a "correction of the sleep apnea with BiPap pressure of 11/7 cm water. A resmed standard Mirage FX mask was used. The final pressure was 11/7 cm of water." (R. 432).

On June 18, 2014, Plaintiff underwent a neuropsychological screening. (R. 412). Plaintiff complained of having:

> Problems with his memory, which started about a year ago with his MS symptoms. He said he forgets people's names, the day of the week, what he is supposed to do such as if he has taken medications or not. He said he often has to reread things because it does not click with him. He said he has had some other cognitive problems as well. He reported problems with speaking and said he stutters sometimes. He said he has some problems with depression and anxiety also and said that started about a year ago too. He said he did have a problem with depression in the past also. He said he gets anxious when there is any type of change. He said he has difficulty sleeping and said he suffers from sleep apnea. He said he does not have any energy and is fatigued. He said his appetite is okay, but said he has gained weight. He said he gained 50 pounds in six months. He said he feels worthless. He reported problems with concentration also.

(R. 413).

Plaintiff was diagnosed with Cognitive Disorder, not otherwise specified, Depressive Disorder, not otherwise specified, Anxiety Disorder, not otherwise specified, sleep apnea, multiple sclerosis, balance problems, neck pain, spinal stenosis, and heat intolerance. Id. at 416.

On July 17, 2014, Plaintiff returned for a follow up visit for his multiple sclerosis and his obstructive sleep apnea. (R. 498). Patient reported that he "thinks that he is doing well with the BiPap," which he uses approximately eight hours a night and he reported that he "feels more alert and awake during the daytime." Id. Plaintiff also stated that "[h]e still has problems with short-term memory and attention during the daytime." Id. at 500. On July 24, 2014, following the Plaintiff's functional capacity study, Plaintiff returned to the emergency room, complaining of exhaustion and the exacerbation of shoulder and neck pain. (R. 555).

On July 24, 2014, a functional capacity evaluation of Plaintiff was completed by Timothy J. Rice DPT. The purpose of this evaluation was "to determine his ability to perform the duties of any occupation." (R. 511). Mr. Rice noted that Plaintiff gave a reliable effort, yielding a reliability score of 88%. Id. Mr. Rice determined that Plaintiff could:

> Mid lift carry at a heavy demand level; hight lift, lower lift, full lift, push, pull, and had overall strength at the medium demand level; sit, walk, bend, crouch, kneel, reach immediate in front right, reach immediate in front left, finger right, and climb stairs on a frequent basis; and stand, balance, reach overhead front right, reach overhead front left, handle right, handle left, and finger left on an occasional basis. Id. For Plaintiff's functional limitations, Plaintiff is limited to ocassional medium weight floor to waist lift; occasional waist to shoulder heavy lift; ocassional medium shoulder to overhead lift; occasional floor to shoulder medium lift.

Id.

Mr. Rice also noted that Plaintiff's results were in the 75[th][5] percentile in walking; 75th percentile in carrying 10 pounds; 72nd percentile in carrying 20 pounds; 85th percentile in carrying 50 pounds; 82nd percentile in pushing 40 pounds; 75th percentile in pulling 40 pounds;

---

[5] Any percentile lower than 70 represents "occasional physical demand" for the category. (R. 512).

74th percentile in pushing 100 pounds; 66th percentile in pushing 100 pounds; 31st percentile in balance; 90th percentile in stair climbing; 96th percentile in bending; 87th percentile in crouching; 71st percentile in kneeling; 72nd percentile in reaching immediate for the left arm and 94th percentile for the right arm; 45th percentile for reaching overhead with the left arm and 57th for the right; 60th percentile for handling with the left and right arm; 68th percentile for left arm fingering and 81st percentile for the right arm; can sit for a combined one hour and forty two minutes; was able to be on his feet for one hour and fifty-six minutes; and rated pain at six out of ten prior to the evaluation and nine out of ten post-test. Id.

Mr. Rice also noted in the evaluation that while a reliable effort was made on 36 out of 41 measures, there were five tests that found unreliable or marginally reliable, including 5 position grip left, rapid exchange grip left, 5 position grip right, 5 position grip left, and crouching.

On July 7, 2015, Plaintiff visited University of Virginia Neurology for a follow-up examination of his multiple sclerosis. (R. 592). Dr. Ward reported that Plaintiff's:

> Examination is notable for symmetric hyperreflexia as well as mild spasticity in his right lower extremity, as well as diminished proprioception and vibration in his distal lower extremities . . . [and] multiple bilateral subcortical and periventricular T2 hyperintensities with a distribution and morphology consistent with demyelinating disease. He has not had a repeat MRI since 2013. Although he had only one clear "attack" (vertigo and urinary retention in 2013), he does have other upper motor neuron findings on examination including hyperreflexia and spasticity in his right lower extremity; subsequent recurrence of his vertigo and bladder symptoms may have represented pseudo-exacerbations. His diagnosis appears most consistent with relapsing multiple sclerosis at this time, although his reported gradually worsening gait and male sex may also indicate the presence of underlying progressive disease as well.

(R. 595). On October 20, 2015, Plaintiff was seen by his occupational therapist and physical therapist for "review of fatigue management and U/E HEP." (R. 627). Mary Rajek noted that Plaintiff presented with "increased numbness in both hands primarily in the fingertips. He

presents with intrinsic tightness" (left more than the right). (R. 627). Leigh Sato, his physical therapist, noted that Plaintiff

> Had bilateral foot sensory loss. . . . He has difficulty with single limb stand without shoes but able to stand for 10 s with boots on. He was able to do a 360 turn but felt some mild vertigo. Dix Halpike was negative to both directions. It is likely that the combination of deceased foot sensation, decreased hip abductor strength and mild vestibular dysfunction contributes to his sense of imbalance.

(R. 627).

On August 28, 2015, Plaintiff went for a follow-up visit at the University of Virginia after being diagnosed with multiple sclerosis. Id. at 640. Plaintiff reported that "[h]e stated that he had an episode at work, in which he had significant vertigo and could not walk. He was taken to the emergency room and underwent neuroimaging." Id. He also reported that his most significant complaints with MS are fatigue, memory impairment, heat intolerance, and pain. Id. Furthermore, Plaintiff described that he gets confused, "has difficulty recalling conversational details and recent events," often loses his train of thought, often misplaces items and forgets why he goes in to rooms, has diminished concentration, and is easily distracted. Id. He also has to reread information, he is slower to type and his handwriting quality is worse, suffers from numbness and tingling in his hands and feet, and diminished concentration. Id.

On August 6, 2016, Dr. Siddiqui completed a *Multiple Sclerosis Medical Source Statement* for Plaintiff. Dr. Siddiqui noted that she had been seeing Plaintiff every three months since September 20, 2013 and that Plaintiff had been diagnosed with multiple sclerosis using clinical exams, Brain MRIs, and Lumbar Functure. (Supp. R. 5). Dr. Siddiqui noted that Plaintiff suffered from symptoms, including, chronic fatigue, balance problems, weakness, intention tremor, depression, difficulty remembering, sensitivity to heat, unstable walking, pain, muscle

spasticity, emotional lability, confusion, loss of manual dexterity, poor coordination, personality change, difficulty solving problems, fatigue, and decreased endurance. Id.

Dr. Siddiqui noted that these symptoms can and will last at least twelve months and that Plaintiff has "significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movement or gait and station. Id. Dr. Siddiqui noted that Plaintiff "unable to perform tasks for prolonged period of time" and is "unable to work for longer than 1-2 hour periods." Id. at 6. Dr. Siddiqui indicated that Plaintiff cannot sit or stand/walk for more than 2 hours a day and Plaintiff would need a job that would all Plaintiff to shift positions and take unscheduled breaks every hour throughout the day. Id. The cause for these breaks are the Plaintiff's muscle weakness, chronic fatigue, and pain/parenthesis, numbness. Id. at 7.

Dr. Siddiqui also noted that Plaintiff's legs would need to be elevated when sitting. Id. Dr. Siddiqui stated that Plaintiff needed to use a cane because of muscle weakness and chronic fatigue and could never lift more than twenty pounds, and rarely less than ten pounds. Id. Dr. Siddiqui also noted that Plaintiff should never twist, stoop, or crouch/squat. Id. As far as limits to Plaintiff's upper extremities, Plaintiff has pain/parenthesis, muscle weakness, incoordination, spasticity, and fatigue. Id. For an eight hour work day, Plaintiff would only be able to use his right and left hands to grasp, turn and twist objects, fine manipulations with his fingers, reaching in front of his body, and reaching overhead for approximately five percent of the day. Id. Dr. Siddiqui noted that Plaintiff is likely to be off task for approximately 25% of the day and emotional factors contribute to Plaintiff's symptoms. Dr. Siddiqui noted that Plaintiff was incapable of "low stress" work and that there would be both good days and bad days, but would generally require Plaintiff to miss work more than four times a month. Id. at 8. Moreover, Dr.

Siddiqui noted that Plaintiff's impairments "as demonstrated by signs, clinical findings and laboratory or test results *reasonably consistent* with the symptoms and functional limitations." Id.

On December 29, 2016, Kathleen Fuchs, PhD, authored a letter supplementing previous the record concerning Plaintiff's evaluation on August 28, 2015. The letter states that:

> His test results indicated reduced manual dexterity, poor processing speed on tasks with a visual scanning component, reduced ability to recall recently learned information, and a severe degree of depression. His test results were seen as consistent with his MS diagnosis. While [Plaintiff's] general intellectual abilities were intact, [Dr. Fuchs] considered his cognitive deficits coupled with his fatigue to be a barrier to employment. His test results suggested that he would have difficulty learning and implementing work policies and procedures, completing tasks requiring fine manual coordination, and working at a pace that would be expected by an employer.

(Supp. R. 3).

The letter also states that his fatigue will likely make him incapable of working either an eight hour work day or a forty hour work week. Dr. Fuchs detailed that Mr. McCullough's explanation,[6] provided with the letter, disagree with the ALJ's decision because Plaintiff's impairment falls under the 11.09 headings "including reduced visuomotor response and impaired ability to process information quickly and efficiently." Id. at 4. The letter also reported that Dr. Fuchs reviewed Dr. Siddiqui's Multiple Sclerosis Medical Source Statement. Id. Dr. Fuchs also reported her consideration of Plaintiff's Functional Capacity Evaluation on September 22, 2016.[7] Id. Dr. Fuchs concluded that

> Taken together, this documentation from medical and allied professionals suggests that Mr. Mathias has physical and cognitive impairments related to his multiple sclerosis diagnosis that meet the eligibility criteria outlined in the SSA listings 11.09 and 12.02. He has impaired bimanual fine motor dexterity, fatigue and weakness with repetitive activity, poor recall of recently presented

---

[6] It should be noted that the undersigned is unclear where the records for Mr. McCullough are contained.
[7] It should be noted that the Record does not contain such evaluation.

information that would impact his ability to properly execute instructions, and poor processing speed that would impair his ability to maintain his work pace. (Supp. R. 4).

### 3. Medical Reports/Opinions

#### a. *Disability Determination at the Initial Level*

On April 10, 2014, agency reviewer, Laura Whittingham, SDM, reviewed Plaintiff's records and completed a physical residual functional capacity ("RFC") assessment. (R. 92). Reviewer Whittingham found the following exertional limitations: Plaintiff could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds (cumulatively more than 1/3 up to 2/3 of an eight hour day); stand and/or walk (with normal breaks) for about four hours in an eight hour workday; sit (with normal breaks) for a total of about six hours in an eight hour workday; and can push and/or pull for an unlimited amount, other than shown, for lift and/or carry. (R. 90). As to postural limitations, Reviewer Whittingham found that Plaintiff could climb ramps and stairs an unlimited amount; could never utilize ladders, ropes, and scaffolds; could occasionally balance, stoop, kneel, crouch, and crawl. (R. 91). No manipulative, visual, or communicative limitations were found. Id. As to environmental limitations, Plaintiff should avoid exposure to extreme cold, extreme heat, wetness, humidity, vibration, and hazards, such as machinery, heights, etc.; does not necessarily to need to avoid noise; and does not necessarily need to fumes, odors, dusts, gases, poor ventilations, etc. (R. 95).

On April 10, 2014 agency reviewer Frank Roman, Ed.D., reviewed Plaintiff's records and completed a psychiatric review technique ("PRT") assessment. (R. 89). Mr. Roman found that "12.02-A medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above, 12.06- A medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above." (R. 89). Mr. Roman found that Plaintiff's

restriction of activities of daily living is mild; plaintiff had mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation, each of extended duration. (R. 89).

                 **b.** ***Disability Determination at the Reconsideration Level***

On May 9, 2014, agency reviewer, Narendra Parikshak, M.D. reviewed the prior RFC assessment and affirmed the findings of the previous RFC's assessment (R. 103-105).

On June 26, 2014, agency reviewer Rosemary L. Smith, Psy.D., reviewed the prior PRT assessment and "12.02-A medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above, 12.04-A medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above; 12.06-A medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above." (R. 101). Ms. Smith found that Plaintiff's restriction of activities of daily living is mild; plaintiff had mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation, each of extended duration. (R. 101).

**C.**    **Testimonial Evidence**

At the ALJ hearing held on October 16, 2015, Plaintiff testified that he is married and has two dependent children, ages six and nine. Plaintiff testified that he received his associate and bachelor's degree in animal science and his master's degree in agriculture. (R. 61-62). Plaintiff testified that he had previously worked at Valley Proteins for approximately eleven months as an RO operator. (R. 63). Tyson Foods as a production supervisor, whose responsibilities including "organizing people, getting product run and loaded correctly on trailers and shipped on time, and

just day-to-day running of a poultry plant." (R. 62). Plaintiff also testified that he previously

worked in a quarry for several years, from 2011 to 2013, as a certified foreman. (R. 62).

Plaintiff's attorney asked him what Plaintiff thinks prevents him from working with

respect to his impairment. Plaintiff responded stating:

A:  I have severe pain in my neck that shoots down into in between my shoulder blades. I have very little feeling on the bottom of my feet. Bad balance problems. Cognition and memory dysfunction. There are times that I shake like I have Parkinson's disease. There – I have spasm issues on occasion which is almost like a seizure.

. . .

A:  I do have numbness in my hands and some – at some – most – most days they're – at some point in time I have no feeling in my fingers.

. . .

A:  It's like the longer I go doing something, especially repetitive, I – I just – I just lose feeling.

. . .

A:  I do use my cane quite often when I feel the need to.

. . .

A:  That helps me to stay balanced. It's – it's a necessity at times.

. . .

Q:  How would you – you talked about feeling pain. How would you describe your pain during the day?

A:  Very intense. There – the hospital uses the scale of 0 to 10. Most days I wake up it's about a 5. It doesn't matter what I do.

. . .

A:  Right now it feels like somebody's got a knife about right here.

Q:  And for the record, right here is where?

A:  Right in – in the base of my neck above my shoulder blades. And it feels like they've got a knife and they're just going up and down like they're trying to open an oyster shell.

. . .

Q:  How is your concentration during the day?

A:  My concentration is nonexistent maybe.

. . .

A:  -- I focus, I can do well for about 10 minutes and then usually I'm gone. I'm – it's like my brain just checks out.

. . .

A:  My memory is horrible. I can remember stuff from 10 years ago, but what I had for breakfast I don't know.

. . .

A:  Yes. There are days that are extremely worse than others.

. . .

15

A:    The very – the very worst days are like if, especially when there's a relapse event, but the – the very worst I've had you don't even – I don't even want to get out of bed. I don't even want to --.

Q:    How long can you stand at one time before you need to sit and – sit or lie down on average?

A:    Probably 20 minutes.

Q:    Okay. And when you're standing, would you be standing without anything, any assistance, or no?

A:    No. Well, yeah, but it would be something close where – because I noticed that I sway a lot.

. . .

A:    I can walk a pretty good distance, but – as long as it's not something where it has to be a straight line.

Q:    And why is that?

A:    I may take two or three steps to the side before I get one going straight.

Q:    How are you sleeping at night?

A:    I have to wear a CPAP so it forces me to breathe. There are times that I have a spasm and I jerk so hard it wakes me up. And then I don't go back to sleep.

. . .

A:    Usually it's a – I'll feel, like, a twitch in my arm and I can see one of my arms will start twitching. But at nighttime, it's – it's a real big, just a whole-body jerk. And it's pretty scary.

(R. 64-70).

Plaintiff also testified regarding his daily activities, including:

A:    On a typical day, I get up, make the coffee, get the kids up, get them fed and to the bus. And usually, by then I'm so worn out that I have to take a nap.

Q:    Okay. And again, take your time as you're answering these and I'm going to keep asking, okay? How long do you usually take a nap for?

A:    It's usually at least an hour.

Q:    And where do you spend most of your day in the – in the house?

A:    Usually in my bed.

Q:    Do you do any – when you feel up to it, of course, do you do any chores around the house?

A:    Yes.

Q:    Okay. Tell us about what chores you might do on a typical day.

A:    I try to keep up with the laundry.

. . .

A:    I try to get everything up to about waist level because when I bend over I lose my balance. And I've fallen more in the last couple years than I did when I was a kid.

. . .

> A:    No. Well, my wife, if it's a sock or something that the kids had throwed
>       out of –that's not in the hamper –
> . . .
> A:    --I get her to pick it up and put it where I can get to it.

(R. 67-68). During the hearing, the ALJ discussed the "summary of reliability." (R. 71). His attorney proffered that his interpretation of this summary and stated that Plaintiff's exams demonstrate that he is "reliable and an honest historian and – and not an exaggerator." (R. 72). His attorney then stated:

> What I would speculate here is that I think, quite frankly, with the spasms and
> everything like that it's fair to say sometimes he might not give very best effort on
> some things out of worrying that he's going to hurt himself. So – and I think that
> worry with the spasms he has and – and their frequencies reasonable and I think
> we'd expect someone to – to put back on those. But it – it would be the same, I
> think, result in a workplace whether it's a mental barrier or a physical barrier to
> doing those fully or a combination thereof.

 (R. 72).

## D.    Vocational Evidence

Also testifying at the hearing was Barry Stephen Hensley, a vocational expert. During his testimony, Mr. Hensley stated that he required more information concerning the description of "rendering operator" and what this job entailed. (R. 76). Dr. Hensley then asked questions of Plaintiff regarding his rendering operator position and Plaintiff provided a more detailed response. Id. Mr. Hensley characterized Plaintiff's past work as 525.134-104 and the SVP is 7. Id. "[N]ormally performed at the light level but often at a medium or heavy level. . . . And in this instance the – from the assessment, it would be heavy." (R. 78).

With regards to Plaintiff's ability to return to his prior work, Mr. Hensley gave the following responses to the ALJ's hypothetical:

> Q:    I'd like you to assume a hypothetical individual of the claimant's age,
>       education, and the past jobs you described. Further assume the individual

is able to lift up to 20 pounds occasionally and 10 pounds frequently. Stand and walk a total of four hours in an eight-hour workday. Occasionally balance, crawl, and kneel. Can crouch. Frequently stoop and climb ramps and stairs. Never climb ladders, ropes, or scaffold. Occasional reaching overhead. Frequent exposure to extreme heat, cold, humidity, and wetness. Occasional exposure to vibrations. Occasional exposure to – I'm sorry. Occasional exposure to hazard conditions including unprotected heights and moving machinery. Be able to perform simply, routine tasks. No work at a fixed product rate pace. Based on this hypothetical, do any of the past jobs exist?

A:    No, ma'am.

Q:    Are you able to identify other jobs?

A:    Yes, ma'am. This job is sort of a hybrid between light and sedentary. And it's probable light with a sit/stand option, so that's what we would be looking at. It'd be light work with a sit/stand option and simple in routine. Stock clerk and order filler, 222.687-022. The SVP would be 2. This is light work. And the National economy, 220,000. Non-postal mail clerk, 209.687-026. The SVP would be 2. Again, light and 72,000. Hand packers, 753.687-038. The SVP is 2. Because of the sit/stand option required here, I'm going to reduce the number which is normally 301,000 to 150,000.

Q:    If I added to that hypothetical that the individual could perform frequent handling and fingering, does that change your answer?

A:    No, ma'am.

Q:    And if I change my hypothetical so that the handling is occasional and the fingering is occasionally on the left upper extremity and frequently on the right upper extremity, does that affect you answer?

A:    The jobs that I've identified wouldn't be available.

Q:    Would you be able to identify any jobs?

A:    No, ma'am.

Q:    And if I added to any of my hypotheticals that due to impairments and limitations the individual would be off-task 20 % or more of the time, are you able to identify jobs?

A:    No, ma'am.

Q:    And if we went to – back to hypothetical #1, and instead of the lifting and carrying 20 and 10, it was 50 and 25, so more the medium range, but everything else from hypothetical #1 were in place. Would you identify – well, what would be your answer? Could you identify medium jobs or not so because of the standing and walking . . .

. . .

A:    Oh, I'm sorry. No, ma'am, it would not be. I'm sorry. Well, with that, correct.

Q:    What kind of jobs would you identify? The same ones you did?

A:    Well, at the medium level standing is usually required most of the day. Let's see, standing and walking for four hours would not be applicable at the medium level.

> Q:      But the jobs that you identified for hypothetical #1 would still fit this?
> A:      Yes, ma'am.

(R. 78-81). Plaintiff's attorney chose not to question Mr. Hensley when provided the chance. (R. 81).

## E.     Report of Contact Forms or Disability Reports

On February 5, 2014, L. Butcher completed a Disability Report following an interview with the Plaintiff. (R. 199). Plaintiff reported that he suffered from multiple sclerosis, memory problems, cognitive problems, and balance problems. Id. at 203. He reported that he stopped working on September 19, 2013, because of his condition. Id. Plaintiff reported that he began seeing Dr. Siddiqui on September 19, 2013 and his last important was on December 30, 2013, with a future appointment on February 12, 2014 that is already scheduled.

On April 29, 2014, another Disability Report was completed following an interview with the Plaintiff. (R. 218). Plaintiff reported that his impairment has changed because his "memory is horrible, used to have very good memory. Short term memory is horrible, has cognitive issues, falls a lot. Cannot drive very far, gets fatigued very easily, heat intolerant," that occurred on approximately February 1, 2014. (R. 218). Plaintiff reported that on October 1, 2013, he went to Sentara RMH Medical Center and his last visit was on April 11, 2014. (R. 219). He stated that his reasons for the visit were his multiple sclerosis, sleep disorder, high cholesterol, and depression and received regular evaluations, examinations, tests were done, prescribed medications, follow up visits, and check-ups. Id. He stated that he "does not really go anywhere, if he goes somewhere someone drives him. He does not drive. Is not comfortable driving." Id. at 221.

## F.     Lifestyle Evidence

On February 11, 2014, an Adult Function Report which stated that Plaintiff did "not have the stamina to work to a work shift," and has become heat-intolerant, but is only able to work about two to three hours without taking a nap. (R. 210). Plaintiff noted that he will wake up in the morning and make breakfast, but then needs to take a nap because he gets tired very quickly. Id. He stated that prior to his impairment, he "could do anything [he] wanted. Now [he] get[s] tired just thinking," and has to get up several times a night to use the bathroom. Id. at 211. Plaintiff reported that he keeps his medicine organized in a box to remind him to take his medication daily. Id.at 212. He reported that he attempts to go outside daily and tries only to drive short distances. Id. at 213. Plaintiff reported that he is able to pay bills, count change, handle a savings account, and balance a checkbook and handle money orders. Id.

He noted that he has "to put everything [he] need[s] to do on the calendar app. [He] forget[s] everything. Id. at 214. Plaintiff also noted that he forget people's names that he has known his entire life and reported that it was embarrassing for him. Id. When explaining how his illnesses, injuries, or conditions were affected by his impairment, Plaintiff noted that he "cannot lift the amounts I use to my balance has been altered so any standing, bending, walking activities have to be limited. My lack of memory caused me trouble completing tasks." Id. He stated that he can follow directions of a recipe and but can do so only if he does not forget where he is in the recipe. Id. at 215.

On an Adult Function Report dated May 9, 2014, Plaintiff stated that he is "heat-intolerant due to the MS and must stay cool in order to function. I have an ice vest that I wear but am still limited in what I can do and for how long. My fatigue due to the sleep apnea MS has shortened the hours in the day that I can function and focus. I have also noticed a decline in my reading comprehension and cognitive abilities." (R. 226). The Plaintiff reported that prior to his

condition, he was able to work a forty hour work week, with an hour commute each way and then do activities when he returned home, like cut wood, mow grass, play with his kids, or work in the garden. (R. 227). He states now that he wakes up, fixes himself breakfast, and then takes his morning medicine. Id. He then does "a limited amount of activity followed by lunch and meds, then a nap." Id.

He reported that he then fixes dinner and takes his evening medication and retires to bed at 7:30 or 8:00 p.m." Id. He stated that was "not sure if MS directly affects my sleep but I have been diagnosed with severe sleep apnea since being diagnosed with MS." Id. He also stated that he has to set an alarm on his phone so that he can remember to take his medication. Id. at 228. He stated that he goes outside approximately three to four times a day, but stays around the house and he does not drive any distance over 30 minute. Id. He stated that he used to handle the bills on his own, but does not feel comfortable doing them now due to his short term memory loss, so he has his wife help make sure he has paid the bills correctly. Id. at 229-30. Plaintiff stated that he attends church on Sundays, when possible, and attends and coaches his son's baseball practice. Id. at 230.

He also stated that he "can become short-tempered with my immediate family due to [his] fatigue and frustration over the loss of abilities." Id. at 231. As to Plaintiff's abilities, he stated that he "tend[s] to stumble or lose [his] balance when bending, standing, and walking. [He] can't remember things as [he] did before-short-term and long term. I have a lack of concentration which affects my understanding and following of directions." Id.

Plaintiff also stated:

My daily routine has been impacted by the feet that going to the bathroom can take up to 25 minutes now. I now struggle with simple things like walking, balance, and memory. I am able to function, usually well, but for very short periods of time compared to my life before MS. Somedays I have severe pain in

my neck and hurt all over. My abilities are even more limited on these days and I find myself needing to  lay down.

(R. 233).

## IV.  THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work…'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-

step sequential evaluation process to determine if a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . ." 20 C.F.R. §§ 404.1520; 416.920 (2011).]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work,

we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011). If the claimant is determined to be disabled or not disabled at one of the five steps, the process does not proceed to the next step. Id.

## I.   ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2017.

2.   The claimant has not engaged in substantial gainful activity since September 19, 2013, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.   The claimant has the following severe impairments: multiple sclerosis (MS), a spinal disorder, obstructive sleep apnea (OSA), obesity, a cognitive disorder, nos, a depressive disorder, now, and an anxiety disorder, now (20 CFR 404.1520(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20CFR 404.1567(b) except that he can stand or walk 4 hours in an 8-hour workday, he can frequently stoop and climb ramps and stairs, he can occasionally balance, kneel, crouch, and crawl, he can never climb ladders, ropes, or scaffolds, he can occasionally reach overhead, he can have frequent exposure to extreme heart, extreme cold, humidity, and wetness, he can have occasional exposure to vibration and hazardous conditions, including unprotected heights and moving machinery, he can frequently handle and finger, he is able to perform simple routine tasks, and he can perform no work at a fixed production rate pace.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.   The claimant was born on January 31, 1978 and was 35 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.   The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from September 19, 2013, through the date of this decision (20 CFR 404.1520(g)).

(R. 29-45).

## V.   <u>DISCUSSION</u>

### A.   **Standard of Review**

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" <u>Shively v. Heckler</u>, 739

F.2d 987, 989 (4th Cir. 1984) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1968)). However, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment…if the decision is supported by substantial evidence." <u>Hays</u>, 907 F.2d at 1456 (citing <u>Laws</u>, 368 F.2d at 642; <u>Snyder v. Ribicoff</u>, 307 F.2d 518, 529 (4th Cir. 1962)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

"[Reviewing] courts are not to try the case de novo. At the same time, they must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474 (1951); <u>Thomas v. Celebrezze</u>, 331 F.2d 541 (4th Cir. 1964). As such, "[reviewing courts] do not reflexively rubber-stamp an ALJ's findings." <u>Lewis v. Berryhill</u>, 858 F.3d 858, 870 (4th Cir. 2017). There are some things an ALJ must do in reaching and explaining his decision. An ALJ has a basic duty of explanation; his decision must be sufficiently explained to permit a court to meaningfully review it. <u>Radford v. Colvin</u>, 734 F.3d 288, 295-95 (4th Cir. 2013). An ALJ must also "explicitly indicate[] the weight given to all of the relevant evidence." <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235-36 (4th Cir. 1984). An ALJ must provide an "accurate and logical bridge" from the evidence to his conclusion. <u>Monroe v. Colvin</u>, 826 F.3d 176, 189 (4th Cir. 2016). There are also some things an ALJ may not do in reaching a decision. An ALJ may not selectively "cherrypick facts that support [his decision] while ignoring relevant evidence [to the contrary]." <u>Lewis</u>, 858 F.3d at 869. Moreover, while an ALJ is not required to discuss

every piece of evidence, <u>Reid v. Commissioner</u>, 769 F.3d 861, 865 (4th Cir. 2014), an ALJ excludes relevant evidence at his peril.

In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

## B.     Contention of the Parties

Plaintiff, in his Motion for Summary Judgment, asserts that the Commissioner's decision "is based upon an error of law and is not supported by substantial evidence." (Pl.'s Mot. at 10). Specifically, Plaintiff alleges that:

1.    The ALJ erred when Defendant "chose to ignore treating source evidence from an August 2015 neuropsychological examination, Dr. Siddiqui, and Dr. Fuchs. Plaintiff argues that the ALJ nor the Commissioner have ever addressed the neuropsychological examination;

2.    Plaintiff also argued that Defendant ignored the evidence which made the decision and the appeal not based on substantial evidence, when the appeals commission did not review Dr. Siddiqui's opinion nor did they explain why the August 2015 neuropsychological evaluation was not considered;

3.    Plaintiff also argues that Defendant mischaracterized the treating source opinion by rejecting the evidence because the opinions showed that there were more limitations than demonstrated in the decisions; and

4.      Plaintiff also argues that Defendant chose to ignore the favorable evidence to Plaintiff and a remand for benefits is appropriate because the substantial evidence contradict the ALJ's position.

(Pl.'s Br. in Supp. of Mot. for Summ. J. ("Pl.'s Br."), ECF No. 10-1, at 9-15). Plaintiff requests "this Court remand his claim for sole purpose of calculating benefits," or in the alternative, "remand for further consideration of Mr. Mathias's treating source opinions." (Id. at 16).

Defendant, in her Motion for Summary Judgment, asserts that the decision is "supported by substantial evidence and should be affirmed as a matter of law." (Def.'s Mot. at 1). Specifically, Defendant alleges that:

1.  Defendant has provided the Court with a supplemental record which renders the Plaintiff's *Motion for Permission to Include Evidence Omitted by Defendant's Answer and Transcript* moot;

2.  The Appeals Council correctly found that the December 29, 2016 Letter would not have affected the ALJ's decision, but also should not have been considered because the Plaintiff failed to supplement the record following the hearing;

3.  Defendant also argued that the Appeals Council determined August 28, 2015 neuropsychological evaluation was not material and had correctly determined that the evaluation would not support changing the ALJ's decision;

4.  Defendant also argued that the Appeals Council correctly determined that the December 29, 2016 Letter and the Multiple Sclerosis Medical Source Statement were not material because that evidence pertained to a later period; and

5.  Defendant then argued that, in the event that the Court determined that additional evaluation is necessary, remand is required rather than a reversal for benefits.

27

(Def.'s Br. in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Br."), ECF No. 18, at 4-14).

**C.    Analysis of the Administrative Law Judge's Decision**

   **1. The Record is complete and includes Dr. Siddiqui's opinion, Dr. Fuchs's
   December 29, 2016 Letter, and the 2015 neuropsychological evaluation.**

The Plaintiff argued that the Defendant had not provided the complete record of
Plaintiff's case because Dr. Siddiqui and Dr. Fuchs's records did not appear in the record
provided to the Court. (ECF No. 9). Plaintiff contended that, without a complete record, "this
Court cannot ascertain whether the Defendant's position is based on substantial evidence." (Pl's
Br. at 3). The Defendant then argued that it "filed a supplemental transcript containing Dr.
Fuchs's December 29, 2016 Letter, and Dr. Siddiqui's August 11, 2016 Multiple Sclerosis
Medical Source Statement" and that because the record has been supplemented, this argument is
moot. (Def's Br. at 4). The Record, as of October 2, 2017, had been sufficiently supplemented to
include Dr. Siddiqui's Multiple Sclerosis Medical Source Statement and Dr. Fuchs's Letter so
that the undersigned can consider whether or not the ALJ's decision was based on substantial
evidence. As such, the undersigned does not need to address this argument and the undersigned
**RECOMMENDS** that the Plaintiff's *Motion for Permission to Include Evidence Omitted by
Defendant's Answer and Transcript* be **DENIED as moot**.

   **2. Was the ALJ's decision based on substantial evidence?**

      **a. The ALJ and the Appeals Council stated that it considered the August
      2015 Evaluation, Dr. Siddiqui's Multiple Sclerosis Medical Source
      Multiple Sclerosis Statement, and Dr. Fuchs December 29, 2016 Letter.**

The ALJ's decision contains reference to Plaintiff's medical records from Plaintiff's
appointments with Dr. Siddiqui. However, Dr. Siddiqui's Multiple Sclerosis Medical Source
Statement, Dr. Fuchs' August 2015 evaluation, nor Dr. Fuchs's December 29, 2016 Letter were

considered in the ALJ's decision because they were submitted and considered subsequent to the ALJ's decision.

The Appeals Commission did consider the 2015 Neurological Evaluation, the December 29, 2016 Letter, and the Multiple Sclerosis Medical Source Statement in its review of the ALJ's decision. The Appeals Court stated in its *Notice of Appeals Council Action*:

> In looking at your case, we considered the reasons you disagree with the decision and the additional evidence listed on the enclosed Order of Appeals Council.
>
> We considered whether the Administrative Law Judge's action, findings, and conclusion is contrary to the weight of the evidence currently of record. We concluded that this additional evidence does not provide a basis for changing the Administrative Law Judge's decision.
>
> We also looked at a letter from Kathleen Fuchs, Ph.D., dated December 29, 2016 (3 pages) and a Multiple Sclerosis Medical Source Statement from Fouzia Siddiqui, M.D., dated August 11, 2016 (4 pages). The Administrative Law Judge decided your case through March 23, 2016. This new information is about a later time. Therefore, it does not affect the decision about whether you were disabled beginning on or before March 23, 2016.

(R. 6). Enclosed in the Order of Appeals Council, the Appeals Council noted that the 2015 Neurological Examination was also considered by the Council. In consideration of the Appeal's Council's description of the evidence that was considered in its decision, the evidence that Plaintiff claimed was ignored by the ALJ and Appeals Council was actually reviewed by the Appeals Council.

In the Fourth Circuit Court of Appeals, decisions need to demonstrate how much weight was "given to all of the relevant evidence" for a reviewing court to determine whether the findings are supported by substantial evidence. Myers v. Califano, 611 F.2d 9080 (4th Cir. 1980); Stawls v. Califano, 596 F.2d 1209 (4th Cir. 1979); Arnold v. Secretary, 567 F.2d 258 (4th Cir. 1977). The Appeals Council, however, is not bound by the same requirements of the ALJ.

The Appeals Council is not required to provide any explanation of its decision. Meyer v. Astrue, 663 F.3d 700, 702 (4th Cir. 2011). While Plaintiff may have wanted an analysis similar to the one provided by the ALJ with regard to the new evidence, the Appeals Council's statement that this evidence was considered is all that is required.

### b. The Court should consider the 2015 Neurological Examination that was submitted to the Appeals Council.

When a physician's opinion is entered as part of the record, it must be considered by the appeals council as "evidence submitted with the request for review in deciding whether to grant review 'if the additional evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision.'" Wilkins, 953 F.2d 93, 95-96 (4th Cir. 1991).

Defendant argued that because the neuropsychological evaluation was completed prior to the ALJ hearing and it is Plaintiff's burden to prove his disability, he should have submitted the evaluation prior to the hearing so the ALJ could consider the evidence. Defendant argued that Plaintiff should not benefit from "sitting idly by ignoring their obligations under the regulations and then cry foul to the Court." Def. Br. at 5. Defendant, however, cites to Mathews v. Apfel, 239 F.3d 589 (3d Cir. 2001), quoting:

> We should encourage disability claimants to present to the ALJ all relevant evidence concerning the claimant's impairments. If we were to order remand for each item of new and material evidence, we would open the door for claimants to withhold evidence from the ALJ in order to preserve a reason for remand.

Def's Br. at 6. This is the exact concern that the dissenting Judge discussed in Wilkins stating that he "differ[s] with the majority because [he is] convinced that 20 C.F.R. 404.970 (1001) was adopted to provide an orderly and speedy disposition of social security claims and to discourage piecemeal litigation." Wilkins, 953 F.2d at 96. Despite this concern, the majority opinion determined that "[r]eviewing courts are restricted to the administrative record in performing their

limited function of determining whether the Secretary's decision is supported by substantial evidence." Wilkins, 953 F.2d at 96.

The Court determined in Wilkins that because the appeals council "specifically incorporated" a treating's physician's retrospective opinion into the record, the court "must review the record as a whole, including the new evidence, in order to determine whether substantial evidence supports the Secretary's findings." Id. at 96. Moreover, Plaintiff does not need to show good cause as to why the evidence was not presented after the ALJ's decision, as Defendant suggests. Good cause is only required when the evidence is presented to the reviewing court for the first time. Wilkins, 953 F.2d at 97. As such, because the Appeals Council has already incorporated the 2015 Evaluation into the Record, the reviewing court must consider it as part of the record to determine whether the ALJ's decision was based on substantial evidence. This is also required of the reviewing court as to the Fuchs's Letter and Multiple Sclerosis Medical Source Statement. Regardless of the date that the document was either authored or submitted to the Appeals Council, these two documents are a part of the Record and the undersigned will consider them in its evaluation. Moreover, the undersigned will not review whether the Appeals Council should have made the documents part of the record, but will analyze whether the Appeals Council properly reviewed the newly introduced evidence.

### c. The December 29, 2016 and Multiple Sclerosis Medical Source Statement were not about a different time.

The Plaintiff contends that "'a treating physician may properly offer a retrospective opinion on the past extent of an impairment.' Wilkins v. Dep't of Health and Human Servs., 953 F.2d 93, 96 (4th Cir. 1991)." Pl's Br. at 10; Wooldridge v. Bowen, 816 F.2d 157 (4th Cir. 1987). "[N]either the opinion of a treating physician nor the determination of another governmental entity are binding on the Secretary." DeLoatch v. Heckler, 715 F.2d 148, 150 n.1 (4th Cir. 1982),

and "[t]he treating physician rule is not absolute." See Hines v. Barnhart, 453 F.3d 559, 563 n.2 (4th Cir. 2006). While not binding on the Commissioner, a treating physician's opinion is entitled to great weight because they "reflect[] an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Mitchell v. Schweiker, 699 F.2d 185, 187 (4th Cir. 1983).

Moreover, "[a]n ALJ may not reject a treating physician's opinion, based on medical expertise, concerning the extent of past impairment in the absence of persuasive contrary evidence." Wilkins, 953 F.2d at 96 (finding that because the record did not contain a medical opinion contrary to the treating physician's opinion, the ALJ's decision was not based on substantial evidence). When an examining doctor conducts an evaluation that occurs after the ALJ decision, it can still relates to the period on or before the ALJ's decision date when it pertains to a condition or level of functioning that is "unlikely to vary in any meaningful way" in between the two. Riley v. Apfel, 88 F. Supp. 2d 572, 575 (W.D. Va. 2000); see also Wilkins, 953 F.2d at 96. Furthermore, while an Appeals Council is required to review and incorporate evidence that is new, material, and relates to the pertinent period of time, the Council is not required to explain its reasoning for denying review. Meyer, 663 F.3d at 702.

The Appeals Council determined that these two reports, while new, concerned a later time and as a result did not affect the decision. (R. 7). The Deputy Commissioner similarly argued that the evidence was not material because it did not relate to the time period on or before the ALJ's decision.[8]   However, evidence is material "if there is a reasonable possibility that the new evidence would have changed the outcome." Wilkins, 953 F.2d at 96 (holding that a letter of the treating physician's opinion regarding the plaintiff's impairment). The Deputy Commissioner did not argue that that evidence is not material because it does not provide a treating source

---

[8] Defendant's Motion does not address the newness or materiality of the 2015 Evaluation.

opinion that would affect the outcome of the case at all. The Deputy Commissioner argued that because the opinions regarded a period after the ALJ's decision, the treating physician's opinions would not affect the outcome of the case. Plaintiff argues that a treating physician's retrospective opinion is allowed and because Dr. Siddiqui had been treating Plaintiff between September 2013 and beyond the date of the ALJ's decision, the treating physician's opinion should be permitted.[9] The Appeals Council, although not required to provide an explanation, was not clear as to what period either document addressed.

The December 29, 2016 Letter authored by Kathleen Fuchs's, Plaintiff's doctor who had been treating him since 2015, specifically discussed her review of the following medical records: (1) Plaintiff's evaluation by Dr. Fuchs's on August 2015, (2) Plaintiff's cognitive evaluation completed at the request of West Virginia Disability Determination Service on June 10, 2014, (3) records completed by Mr. McCullough who had indicated disagreement with the ALJ's decision, (4) the Multiple Sclerosis Medical Source Statement that was completed by Dr. Siddiqui on August 11, 2016, and (5) the Functional Capacity Evaluation that was completed on September 22, 2016 which tested Plaintiff's physical capacity. Many of these documents were reviewed by the ALJ in her determination that Plaintiff does not meet the 11.09 requirements.

Dr. Fuchs is one of Plaintiff's treating physicians, who was referred to him by Drs. Ward and Jones. Dr. Fuchs first evaluated Plaintiff in August of 2015 and "his test results indicated reduced manual dexterity, poor processing speed on tasks with a visual scanning component, reduced ability to recall recently learned information, and a severe degree of depression." (Supp. R. 3). Dr. Fuchs also noted that "[h]is tests results suggested that he would have difficulty learning and implementing work policies and procedures, completing task requiring fine manual

---

[9] The Plaintiff determined that the Deputy Commissioner treated both Dr. Fuchs' and Siddiqui's Letters the same way. Pl. Br. at 8.

coordination, and working at a pace that would be expected by an employer. Further, his fatigue likely rendered him incapable of completing an 8 hour work day or a 40 hour work week." Id.

In her opinion letter, Dr. Fuchs considered the cognitive evaluation of Plaintiff by Tracy Cosner-Shepherd, MA, which took place on June 10, 2014 and her own evaluation of Plaintiff in 2015. Dr. Fuchs also considered the Multiple Sclerosis Medical Source Statement that was completed by Dr. Siddiqui on August 11, 2016. While the date on the statement was post-ALJ decision, Dr. Siddiqui had been treating Plaintiff since his referral in September 2013, well before March 23, 2016. In fact on the Statement, Dr. Siddiqui noted that she had been seeing Plaintiff every three months since the initial referral on September 2013. (Supp. R. 5).

Dr. Fuchs's Letter also considers the Functional Capacity Evaluation that was completed on September 22, 2016. This evaluation was completed after the date of the ALJ's decision, but does not necessarily negate the findings of Plaintiff's treating physician because reviewing only one document would not erroneously affect her determination by its consideration. While both the Medical Source Multiple Sclerosis Statement and Dr. Fuchs's Letter were dated post-ALJ decision, both records included a treating physician's opinion which was adequately demonstrated to have existed prior to the ALJ's decision date. Furthermore, the Dr. Fuchs also considered more than just her August 2015 evaluation, including records that are of the time period prior to the ALJ's decision and even considered in the ALJ's decision. As a result of the undersigned's review of the opinion's provided by Drs. Fuchs and Siddiqui, the undersigned recommends that the Court view the opinions as retrospective opinions that were made about Plaintiff's condition on or before the date of the ALJ's decision.

> **d. The undersigned cannot determine whether the decision was based on substantial evidence.**

Plaintiff argued in his Brief that the ALJ mischaracterized the evidence when it stated that Plaintiff "did not meet the MS Listing, Mr. Mathias was limited to frequent handling and fingering, and Mr. Mathis was limited to 'simple routine work.'" (R. 25, 27).

The ALJ determined that:

> The records that have been submitted since the DDS completed its review do not warrant a different determination at the third step of the evaluation process. No treating or examining physician or psychologist has identified medical signs of findings that meet or medically equal the requirements of any section of Appendix 1.

(R. 30).

To find that Plaintiff has met the multiple sclerorsis listing, Plaintiff must show that:

11.09 *Multiple Sclerosis*: With:
A.   Disorganization of motor function as described in 11.04B; or
B.  Visual or mental impairment as described under the criteria in 2.02, 2.03, 2.04, or 12.02; or
C. Significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process.

11.04 *Central nervous system vascular accident.* With one of the following more than 3 months post-vascular accident:
. . .
> B.    Significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C)

2.02 *Loss of central visual acuity*. Remaining vision in the better eye after best correction is 20/200 or less.

2.03. *Contraction of the visual field in the better eye*, with:
A. The widest diameter subtending an angle around the point of fixation no greater than 20 degrees.
B. An MD of 22 decibels or greater, determined by automated static threshold perimetry that measure the central 30 degrees of the visual field (see 2.00 A6d).
OR
C.  A visual field efficiency of 20 percent or less, determined by kinetic perimetry (see 2.00A7c).

2.04 *Loss of visual efficiency, or visual impairment, in the better eye*:
A. A visual efficiency percentage of 20 or less after best correction (see 2.00A7d).
OR
B. A visual impairment value of 1.00 or greater after best correction (see 2.00A8d).

12.02 *Organic Mental Disorders*: Psychological or behavioral abnormalities associated with a dysfunction of the brain. History and physical examination or laboratory tests demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

   A.   Demonstration of a loss of specific cognitive abilities or affective changes medically documented persistence of at least one of the following:
       1.   Disorientation to time and place; or
       2.   Memory impairment, either short-term (inability to learn new information), intermediate, or long-term (inability to remember information that was known sometime in the past); or
       3.   Perceptual or thinking disturbances (e.g., hallucinations, delusions); or
       4.   Change in personality; or
       5.   Disturbance in mood; or
       6.   Emotional lability (e.g., explosive temper outbursts, sudden crying, etc.) and impairment in impulse control; or
       7.   Loss of measured intellectual ability of t least 15 I.Q. points from premorbid levels or overall impairment index clearly within the severely impaired range of neuropsychological testing, e.g., the Luria-Nebraska, Halstead-Reitan, etc.,

           AND

   B.   Resulting in at least two of the following:
       1.   Marked restriction of activities of daily living; or
       2.   Marked difficulties in maintaining social functioning, or
       3.   Marked difficulties in maintaining concentration, persistence, or pace; or
       4.   Repeated episodes of decompensation, each of extended duration;

           OR

   C.   Medically documented history of a chronic organic mental disorder of at least 2 years' duration that has caused more than a minimal limitation of

36

ability to do basic work activities, with symptoms or signs currently
attenuated by medication or psychosocial support, and one of the
following:

1. Repeated episodes of decompensation, each of extended duration; or
2. A residual disease process that has resulted in such marginal
   adjustment that even a minimal increase in mental demands or change
   in the environment would be predicted to cause the individual to
   decompensate; or
3. Current history of 1 or more years' inability to function outside a
   highly supportive living arrangement, with an indication of continued
   need for such an arrangement.

The ALJ determined that:

The claimant's MS does not meet Listing 11.09 because it is not associated with
disorganization of motor function; a visual or mental impairment as described in
Listings 2.02, 2.03, 2.04 or 12.02; or significant reproducible fatigue of motor
function with substantial muscle weakness on repetitive activity, demonstrated on
physical examination, resulting from neurological dysfunction in areas of the
central nervous system known to be pathologically involved by the multiple
sclerosis process.

(R. 30).[10]

At issue in both the Plaintiff's and Defendant's Motions is whether Plaintiff's

impairments meet the 11.09(C) requirements.[11] The ALJ determined that "the evidence fails to

establish the presence of the 'paragraph C' criteria." (R. 31). Defendant argues that Dr. Fuchs

"did not describe any medical findings that correlated with these extreme criteria." (Def's Br. at

8). Plaintiff, however, argued that the disorganization of motor functioning and reproducible

---

[10] The ALJ stated that:
   When reviewing 11.09(B), the ALJ the mental impairments must result in at least two of the
   following: marked restriction of activities of daily living; marked difficulties in maintaining social
   functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated
   episodes of decompensation, each of extended duration. A marked limitation means more than
   moderate hut less than ex1reme. Repeated episodes of decompensation, each of extended duration,
   means three episodes within 1 year, or an average of once every 4 months, each lasting for at least
   2 weeks.
(R. 30-31). The ALJ's decision regarding the 11.09(B) was not addressed in Plaintiff's Motion, but Defendant
argued that Plaintiff had not met the requirements under subparagraph (B), finding that there was no impairment of
Plaintiff's mental status.
[11] Neither Motion for Summary Judgment discussed obesity, although the ALJ's decision determined that Plaintiff
did not meet those requirements as well.

fatigue were demonstrated by the medical records. Plaintiff demonstrated this by citing to the following medical records:

When Plaintiff was tested, during Dr. Fuchs's evaluation, that Plaintiff performed "below average" on his 9hole peg test, and he was in the 16th percentile of individuals with multiple sclerosis. The pegboard test is a test of fingertip dexterity and gross movement of the hand, fingers and arm in patients with impairments of the upper extremity resulting from neurological and musculoskeletal conditions. Following Plaintiff's Functional Capacity Examination on July 23, 2014, Plaintiff was admitted to the emergency room claiming that he was exhausted, his shoulder and neck paid was worse, and felt like he was having an MS relapse. (R. 555). He stated that he could not take the pain. Id.

Plaintiff further argued that his dysmetria is well documented throughout the medical records. On October 16 and December 30, 2013, the records indicate Plaintiff suffered from dysmetria. On February 20, 2014, Dr. Siddiqui noted that Plaintiff "has finger-nose-finger with dysmetria bilaterally." (R. 265).

Defendant's only argument was in regard the accuracy of Plaintiff's medical records was essentially discredited due to repeated evidence that Plaintiff "made less than adequate effort with some aspects of testing." (Def. Br. at 9). This was echoed by the ALJ's determination that "[t]he manipulative limitations cited by the physical therapist are found to be less reliable based upon the reliability information in the chart in the physical therapist's report. Therefore, the manipulative limitations assessed by the physical therapist are not given weight herein." (R. 42). Defendant specifically mentioned Dr. Fuchs's note her evaluation that "there was evidence that he made less than an adequate effort with some aspects of testing (specifically, testing of his memory)." Def. Br. at 8. Defendant finds this to be consistent with Timothy J. Rice's evaluation

38

finding that "Plaintiff's efforts on testing of this grip at his July 24, 2014 Functional Capacity Evaluation were not reliable." Id. at 10. In the August 2015 neurological evaluation, Dr. Fuchs actually noted that Plaintiff "demonstrated very good learning on a rote verbal-learning task, and adequate short-term retention but as noted, very poor delayed recall and recognition suggestive of incomplete effort." (R. 644).

However, Dr. Fuchs also noted that "toward the end of this session he seemed to 'shut down' and provided a markedly atypical pattern of recognition memory performance. This is in contrast with generally intact performance on a measure of effort given at the beginning of the evaluation." Id. The Defendant, in its brief, also stated that the ALJ did not give consideration to these results because the ALJ believed these results to be unreliable. Def's Br. at 9.  Defendant cites to Timothy J. Rice's Functional Capacity Examination which determined that Plaintiff exhibited a reliable effort on 36 of the 41 consistency measures, but 5 position grip left, rapid exchange grip left, and 5 position right grip were considered unreliable. The 5 position grip left and crouching tests were deemed marginally reliable. Total, however, Plaintiff's "evaluation suggest[s] that Mr. Mathias gave a reliable effort, with 41 consistency measures yielding a reliability score of 76 out of 86 (88%)." (R. 511).

The ALJ noted in its decision that, when questioned during the hearing, Plaintiff's counsel stated that "the summary stated that the claimant demonstrated reliable effort." (R. 42). The Plaintiff argues that his endpoint during this evaluation was actually considered "psychological," which is defined as "[v]oluntary test termination by the patient based on complains of fatigue, excessive discomfort, or inability to complete the required number of movements during the testing interval (cycle)." (R. 502). This is consistent with Plaintiff's hospitalization that same day.

While the evidence that is presented to the undersigned contains evidence that supports Plaintiff's claim, there is evidence that the ALJ and the Deputy Commissioner believe to represent that Plaintiff's results are unreliable.  In such a circumstance, the undersigned cannot render a recommendation of whether the decision was based on substantial evidence, absent an actual evaluation of the evidence in consideration of the other evidence presented during the hearing. While the December 29, 2016 Letter and Multiple Sclerosis Medical Source Statement are new, material, and about the appropriate time period, consideration of this evidence must be done by the fact finder. The analysis of remand in this case is completed below.

### 3. Remand to Review Dr. Fuchs's December 29 Letter, the 2015 Neuropsychological Evaluation, and Dr. Siddiqui's Multiple Sclerosis Medical Source Statement is Required.

"A district court may remand a final decision of the Secretary only as provided in sentences four and six of 42 U.S.C. § 405(g):"

> [I]n conjunction with a judgment affirming, modifying, or reversing the Secretary's decision (sentence four) or [O]r in light of additional evidence without any substantive ruling as to the correctness of the Secretary's decision, but only if the claimant shows good cause failing to present the evidence earlier (sentence six).

Under sentence four, remand is appropriate when a reviewing court determines either that the Commissioner's findings of fact are not supported by substantial evidence (prong 1), or that the Commissioner has made a legal error (prong 2). Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). In this circumstance, the reviewing court can "modify[] or revers[e] the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The reviewing court rules on the correctness of the Commissioner's decision and will enter a final judgment affirming, modifying, or reversing the decision. Krishnan v. Barnhart, 328 F.3d 685 (D.C. Cir. 2003). Remand under sentence four is appropriate when the

Appeals Court had made new evidence part of the record, but has reviewed that evidence erroneously. Wilkins, 953 F.2d at 96; Riley v. Apfel, 88 F. Supp. 2d 572 (W.D. Va. 2000); Meyer v. Atrue, 662 F.3d 700 (4th Cir. 2011). While the Appeals Council is not required to articulate findings when it considers new evidence, "an express analysis of the Appeals Council's determination would [be] helpful for purposes of judicial review." Meyer v. Astrue, 662 F.3d 700, 706 (4th Cir. 2011) (quoting Martinez, 444 F.3d at 1207-08). Lack of "additional fact finding does not render judicial review 'impossible'—as long the record provides 'an adequate explanation of [the Commissioner's] decision." Meyer, 662 F.3d at 707 (quoting DeLoatche, 715 F.2d at 150).[12]

Plaintiff argues that because the Multiple Sclerosis Medical Source Statement, the December 29, 2016 Letter, and the 2015 Evaluation were demonstrative of Plaintiff's meeting of the 11.09 requirements, the ALJ's decision lacks substantial evidence because the ALJ chose "to ignore evidence that most favors Mr. Mathias." Pl. Mot. at 15. As such, Plaintiff is requesting a remand strictly for the calculation of benefits for Plaintiff. Id. Defendant argues that "reversal of an administration decision with an award of benefits is the proper remedy only in 'rare circumstances.' Florida Power & Light Co. v. Lorian, 470 U.S. 729, 744 (1985)." Def's Br. at 14-15. Defendant argued that only when all factual issues have been resolved can this type of reversal occur and that if the Court wants further evaluation, remand for that purpose must be done. Id.

Here, the Appeals Council made the evidence part of the record, but did not evaluate the additional evidence beyond stating that it was about a different time period. A further

---

[12] In Meyer, the Court explained that it can "affirm[] an ALJ's denial of benefits after reviewing new evidence presented to the Appeals Council because [it] concluded that 'substantial evidence support[ed] the ALJ's findings" but also has reversed an ALJ's denial of benefits when the decision was not based on substantial evidence. Meyer, 662 F.3d at 707.

explanation as to why the new evidence should not have been considered and why the 2015 neuropsychological evaluation did not affect the decision, while not required, could have allowed the undersigned to do a proper evaluation to determine whether the decisions were made based on substantial evidence.

In this situation, the evidence that the ALJ and Appeals Council reviewed to make a final decision is contradicting to the treating physician's opinion and no fact finder has adequately explained or reconciled the conflicting evidence in the record. See Meyer, 662 F.3d at 707 (stating that "no fact finder has made any findings as to the treating physician's opinion or attempted to reconcile that evidence with the conflicting and supporting evidence in the record" and that "assessing the probative value of competing evidence is quintessentially the role of the fact finder"). Here, the treating physicians' opinions are directly contradictory to the ALJ's decision. The ALJ decision specifically stated that "no treating or examining physician or psychologist has identified medical signs or findings that meet or medically equal the requirements of any section of Appendix 1." (R. 32). The ALJ also determined

> Whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record.

(R. 32). The ALJ determined that:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however the claimant's statements concerning the intensity, persistence and limiting effect these symptoms are not directly credible in light of the longitudinal medical record as a whole.

(R. 33).  The Appeals Court affirmed the ALJ's decision, adding no new consideration of what the ALJ had previously determined. While the evidence is a part of the record, the Court is not the fact finder. Competing evidence, including the conclusions of the ALJ's determination of the

unreliability, should be reviewed by the fact finder. As such, the record should be reviewed in its entirety so that the fact finder can deliberate on how the contradicting and supporting evidence should be considered.

## 6.  RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying the Plaintiff's application for Disability Insurance Benefits and Supplemental Security Income is supported by substantial evidence. Accordingly, I **RECOMMEND** that

> Plaintiff's Motion for Summary Judgment (ECF No. 10 be **GRANTED IN PART**, Defendant's Motion for Summary Judgment (ECF No. 17) be **GRANTED IN PART**, and the decision of the Commissioner be vacated and this case be **REMANDED** pursuant for further proceedings for the reasons set forth herein and in particular consider of the following medical evidence, including the August 2015 Neuropsychological Evaluation, the December 29, 2016 Letter, and the Multiple Sclerosis Medical Source Statement.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge.   Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Court **DIRECTS** the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia. Additionally, as this report and recommendation concludes the referral from the District Court, the Clerk is further **DIRECTED** to terminate the magistrate judge's association with this case.

Respectfully submitted this July 3, 2018

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE